COVINGTON, Judge.
Plaintiff, IT Corporation, appealed from a decision of the Commission on Ethics for Public Employees (the Commission) finding the corporation in violation of Sections 1112 A and 1118 of the Governmental Ethics Code (the Code), and imposing the maximum fine of $5,000 for each of the two particular violations. The Commission’s decision further declared void the July 17, 1979 contract between the Department of Natural Resources (DNR) and IT Corporation, and ordered rescission of the contract and repayment of the sum of $375,598 by IT Corporation to the Treasury of the State of Louisiana.
The record reflects that the Commission, at its February 25,1982 meeting, concluded its private investigation into allegations contained in two sworn complaints that IT Corporation (sometimes referred to as «ITC”) an(j others had violated provisions of the Governmental Ethics Code.
Thereupon, the Commission conducted a public hearing on March 17 and 18, 1983 for the purpose of examining the charges against ITC.
Notice of the charges was given to ITC by correspondence of March 12, 1982. At that time additional notice was given to ITC that the Commission would receive, during the course of the proposed public hearing, evidence relevant to the proposition that one or more of the cited violations may have influenced the making of any or all of certain state contracts involving ITC catalogued therein.
During the course of the March 1982 correspondence, ITC was advised that the Commission, upon finding that the making of any of the aforesaid contracts was influenced by violations of the Code, might cancel or rescind any of those contracts.
The public hearing was scheduled for May 27 and 28, 1982. On the eve of that public hearing an Application for Supervisory Writs of Certiorari, with a Request *253 for a Stay of All Further Proceedings, was filed by ITC with this Court, and thereafter we granted the Application and the Request for a Stay of Proceedings.
At the conclusion of the appellate proceedings, this Court decided that ITC was subject to the jurisdiction of the Commission and remanded the case to the Commission for further proceedings “consistent with [that] opinion, and according to law.” Commission on Ethics for Public Employees v. IT Corporation, 423 So.2d 695 (La.App. 1st Cir.1982).
In September, 1979, ITC submitted to the DNR a feasibility study entitled “Study Report: Model Regional Hazardous Waste Recovery and Disposal Facility” pursuant to its contract with the DNR. In that study, ITC recommended the selection and designation of a tract of land for location of the proposed “Model Regional Hazardous Waste Recovery and Disposal Facility,” described as “Area I”, and being generally a tract theretofore owned by Mr. and Mrs. Shelby Robert (hereinafter referred to as the “Robert tract”).
Prior to the submission of the report to the DNR, ITC made a number of contacts with Mr. and Mrs. Robert, individually and through their attorney, and actively engaged in negotiations with them, through their attorney, for the execution of an option for ITC to acquire the Robert tract.
Prior to September 1979, and during the period of time that it was in the process of preparing and formulating the report, ITC obtained soil borings on the Robert tract, had soil analyses made and made several site inspections. After submission of the report to the DNR, an option agreement for the acquisition by ITC of the Robert tract, with an effective date of September 25, 1979 was entered into, which option agreement was prepared by the Roberts’ attorney on behalf of both parties. ITC was paid by the State for preparation of the feasibility study on October 9,1979, the agreed sum of $375,598.
By agreement entitled “Subcontract” dated June 17, 1979, ITC and Research Associates of Louisiana, Inc. (“Research Associates”) entered into a contract by which Research Associates was to render to ITC certain services, consisting generally of “site location analysis and recommendation” pertaining to ITC’s “feasibility study” contract with the DNR. Pursuant to this contract, ITC agreed to pay Research Associates the sum of $53,836 for its services.
At the time ITC entered into the above-mentioned contract, and until the time Research Associates was paid by ITC, Research Associates was a party to contracts with the DNR. In these contracts Research Associates, primarily through Ned A. Cole, rendered essential and comprehensive services in the field of hazardous waste management, including particularly the establishment and maintenance of a comprehensive and integrated hazardous waste management program by the DNR. ITC knew of the existence of one or more of these contracts at the time it entered into its arrangement with Research Associates.
Prior to the July 1979 award of the contract to ITC to make the study report, the record establishes that the following events occurred:
(a) By correspondence of January 27, 1979, Ned A. Cole wrote to ITC inviting ITC to “discuss [the] opportunity” for it to effectuate an expansion into the state of Louisiana to assist in providing a solution to the waste disposal problem.
(b) By correspondence of March 30,1979, Cole forwarded to ITC a “preliminary proposal” that he had prepared, consisting primarily of an outline for the subsequent submission by ITC to the State, of the “Proposal for a Model Regional Hazardous Waste Recovery and Disposal Facility.”
(c) By cover letter of April 18, 1979, ITC submitted to the State the “Proposal for a Model Regional Hazardous Waste Recovery and Disposal Facility.”
(d) The “Proposal” contained, among other things, declarations that Cole, through Research Associates, would serve as a subcontractor to ITC if it was awarded *254 a contract for the feasibility study and that “Ned Cole serves as Consultant to the Department of Natural Resources for projects including ... the hazardous waste management program and the formulation of rules and regulations governing hazardous waste
(e) Karen Cole, an employee of the Department of Natural Resources, prepared for execution by the DNR and ITC, a contract for the “Development of a Model Regional Hazardous Waste Recovery and Disposal Facility for Louisiana,” dated April 25, 1979, with a “Statement of Work” based substantially upon the information contained in the ITC “proposal”.
(f) During the course of the Regular Session of the 1979 Louisiana Legislature, the Legislature was invited by House Concurrent Resolution No. 79 to suspend applicable provisions of the public bid law and the professional services contract law so as to authorize the Department of Natural Resources to enter into the “sole source” contract of April 25, 1979 with ITC, but the concurrent resolution was not adopted.
(g) Karen Cole, thereafter, prepared a “Request for Proposal for Conduct of a Study to Develop a Model Regional Hazardous Waste Recovery and Disposal Facility for the State of Louisiana” (REP), dated May 29, 1979, with cover letter of same date, and forwarded the RFP to a number of industrial concerns, including ITC; the “Statement of Work” contained in and made an integral part of the RFP was extracted by Ms. Cole substantially from the earlier proposal submitted by ITC to the State, and the subsequent “sole source” contract of April 25, 1979.
(h) By correspondence of May 31, 1979, Cole wrote to ITC observing that a major competitor of ITC, Catalytic Inc., had not requested a copy of the RFP, and he doubted that Catalytic, Inc. was aware of the proposed project.
(i) That same date, in separate correspondence, Cole advised ITC that he had “lined up” “Mayes” and “Smith” (two Research Associates employees or associates) for the next visit to Louisiana by ITC’s representative, John Theiss.
(j) By letter of June 8,1979, Cole advised ITC that he had caused RFP’s to be sent to other industrial concerns in order to “insure that [there was no] criticism .... ” Cole noted that he had answered in the “affirmative” a call concerning RFP in which the question was asked whether or not the 60 day period meant that the project had to be completed in 60 days.
(k) On June 17, 1979, ITC entered into the “agreement” with “Research Associates of Louisiana” (signed by Ned A. Cole on behalf of Research Associates) which had attached to it an exhibit outlining the scope of services and referencing certain parts of the initial “Proposal for a Model Regional Hazardous Waste Recovery and Disposal Facility” submitted by ITC to the State prior to April 25, 1979.
(l) At the time these events were taking place, Research Associates was under contract with the DNR for “special services, development of hazardous waste management system” by which Research Associates was required, generally, to prepare a hazardous waste management plan by developing the permit system. Simultaneously, Research Associates was preparing for submission to the State a proposal in response to an RFP issued July 20, 1979 for another contract to assist in the implementation of the State hazardous waste management program and, among other things, to perform permit evaluation pertinent to the administration of the hazardous waste management program. (This contract was awarded to Research Associates, in September of 1979.)
(m) By document dated June 27, 1979, ITC submitted to the DNR its “Proposal for the Development of a Model Hazardous Waste Facility.”
(n) Sometime between July 9 and 13, 1979, Karen Cole and Jim Porter, an employee of the DNR, prepared evaluations of the several proposals submitted; and, thereafter, recommended to the Secretary of the Department of Natural Resources that an award be made to ITC.
*255 (o) The proposal previously submitted by ITC on June 27, 1979 listed, as a proposed subcontractor, Ned A. Cole, who was represented as then serving as a consultant to the DNR.
(p) Ms. Cole prepared a contract executed on July 17,1979, the Secretary of the Department of Natural Resources, awarding to ITC the contract for the preparation of a “Model Regional Hazardous Waste Recovery and Disposal Facility for Louisiana”, for the sum of $375,598.
(q) ITC submitted to the DNR on September 21, 1979, its invoice for the services performed pursuant to the feasibility study; and, on the basis of a recommendation by Ms. Cole as to the correctness of the amount, Murray Hutchinson, a Department of Natural Resources official, approved payment to ITC.
On the following dates payments were made by Research Associates to Karen Cole: (1) July 2,1979 — $6,400, (2) August 2, 1979 — $1,200, (3) September 17, 1979 — $1,-500, (4) January 19, 1980 — $1,000, (5) April 10, 1980 — $3,000, (6) July 1, 1980 — $500, (7) August 9, 1980 — $500, (8) August 16, 1980 —$500, (9) October 14, 1980 — $750 and (10) November 20, 1980 — $1,750.
As applied to ITC, the primary provisions of the Governmental Ethics Code are Sections 1112, 1113, 1114, and 1118 which then provided (in pertinent parts):
“1112. Acts affecting a personal economic interest
A. Economic Interests of a State Employee. No state employee shall participate in a transaction involving the state in which he has a personal substantial economic interest, as distinguished from a general class or general group of persons, of which he may reasonably be expected to know.
B. Economic Interest of Persons in which a State Employee Has An Interest. No state employees shall participate in a transaction involving the state in the consequence of which, to his actual knowledge, any of the following persons has a direct substantial economic interest, as distinguished from a general class or general group of persons:
(1) His spouse or child; or
(2) Any person in which he has an economic interest of which he may reasonably be expected to know; or
(3) Any person of which he is an officer, director, trustee, partner or employee; or
(4) Any person with whom he is negotiating or has an arrangement concerning prospective employment; or
(5) Any person who is a party to an existing contract with such state employee or an obligee of such state employee as to a thing of economic value and who, by reason thereof, is in a position to affect directly such employee’s economic interests.
C. Disqualification. Every state employee shall disqualify himself from participating in a transaction involving the state when a violation of this Part otherwise would result. The procedures for such disqualification shall be established by regulations issued pursuant to R.S. 42:1119.
D. Economic Interest. The term “economic interest” shall not include:
(1) The interest of a state employee in his position, rank, salary or other matters arising solely from his state employment or;
(2) The interest of a state employee or of a person referred to in Sub-section B of this Section as a member of the general public or of any significant economic or other segment of the general public.
[[Image here]]
F. Permitted Exceptions. Permitted exceptions from the prohibitions contained in this Section are as follows:
(1) Nothing in this Section shall prevent a state employee from sharing in any compensation received from the state by a person of which such state employee owns or controls less than ten per centum, provided such state employee did not assist in the procurement of such compensation.
*256 (2)Nothing in this Section shall prevent a state employee from sharing in any compensation received from the state by a person of which such state employee owns or controls any portion thereof, provided such compensation was received by such person as a result of having made the -lowest sealed competitive bid on a state contract or subcontract and having had such bid accepted by the state or the general contractor and provided that such state employee did not assist in the procurement of state’s or the general contractor’s acceptance of such low bid. Added Acts 1964, No. 110, Section 1.
1113. Compensation for state employees from non-state sources
A. Payments for services to the State. No state employee shall receive any thing of economic value, other than his compensation from the state, and other normal employee benefits provided by the state, for or in consideration of personal services rendered or to be rendered to or for the state. Anything of economic value received by a state employee prior to or subsequent to his state employment shall be presumed, in the absence of a showing to the contrary by a clear preponderance of evidence, not to be for, or in consideration of, personal services rendered or to be rendered to or for the state.
B. Compensation for Service to Others. No state employee shall receive any thing of economic value for or in consideration of personal services rendered, or to be rendered, to or for any person during the term of his state employment unless such services meet each of the following qualifications:
(1) The services are bona fide and are actually performed by such employee; and
(2) The services are not within the course of his official duties; and
(3) The services are not prohibited by R.S. 42:1112 or by applicable laws or regulations governing non-state employment for such employee; and
(4)The services are neither performed for nor compensated by any person from whom such employee would be prohibited by R.S. 42:1114 from receiving a gift; unless the services and compensation are fully disclosed in writing to the head of the employee’s agency.
C.Payments for Future Services to Others. No state employee shall receive, directly or indirectly, any thing of economic value during the term of his state employment in consideration of personal services to be rendered to or for any person subsequent to the term of such employment. Nothing contained in this Sub-section shall be deemed to prevent a state employee from entering into a contract for prospective employment during the term of his state employment unless otherwise prohibited by R.S. 42:1116.
* # * ⅝ Sfc *
1114. Gifts
General rules for all employees. No state employee shall receive, accept, take, seek or solicit, directly or indirectly, any thing of economic value as a gift, gratuity or favor from any person or from any officer, director, agent or employee of such person, if such person:
(1) Has or is seeking to obtain contractual or other businesses or financial relationships with such employee’s agency; or
(2) Conducts operations or activities which are regulated by such employee’s agency; or
(3) Has interests which may be substantially affected by such employee’s performance or non-performance of official duty.
And if such state employee knew or reasonably should have known of the existence of any of the conditions covered above. Added Acts 1964, No. 110, Section 1.
$ ⅝ ⅛ ‡ *
1118. Illegal payments
A. Payments as Compensation. No state employee or other person shall *257 give, pay, loan, transfer, deliver or offer to give, pay, loan, transfer or deliver, directly or indirectly, to any other state employee or person any thing of economic value which he would be prohibited from receiving by any other provisions of this Part. Added Acts 1964, No. 110, Section 1.”
With the foregoing facts before it, the Commission found that ITC had violated Section 1112 A, as charged, ruling:.
In Charge I, it is clear that IT Corporation as a “state employee” actively “participated” in the study (a “transaction”) at a time when IT Corporation had a “personal substantial economic interest” in its recommendation to the State of the “Robert tract”. A “personal substantial economic interest” does not presuppose the antecedent existence of a proprietary interest in the title to immovable property, as was advocated to the Commission by IT Corporation. Rather, this interest of IT Corporation in the feasibility report was achieved essentially through its active — and successful — negotiations as early as the middle of August of 1979, through Vincent Sotile, [the Roberts’ attorney] with the Roberts with a view toward obtaining an option to acquire title to the subject tract of land. It is of significance that Mr. Sotile in his August 31, 1979 letter to IT Corporation, during the course of his “report” relative to “[his] negotiations to date,” noted and informed IT Corporation that he had met with Mr. Robert “on several occasions” and that Mr. Robert “has agreed to negotiate.” The controlling elements of that negotiation and the progress made in connection therewith is further developed in Mr. Sotile’s letter of that date. Similarly, in correspondence of September 1, 1979 by Ned A. Cole to IT Corporation, it is noted that: “negotiations relative to land purchased — John is keeping up with this_” Correspondingly, the soil bor-ings of Research Associates, coupled with the soil testing analyses by Soil Testing Engineers, Inc., were limited to and confined to the Robert tract.
The testimony of Mr. Vincent Sotile, together with that of Mr. and Mrs. Shelby Robert, confirm that IT Corporation was actively negotiating with the Roberts for acquisition of the Robert tract prior to submission of its feasibility report on or about September 29, 1979 and that most of the essential ingredients of the September 25, 1979 option were reached pri- or to that date.
IT Corporation’s explanation for its active pursuit of an option agreement with the Roberts is, essentially, that the contracts made by IT Corporation to the Roberts was nothing more than a ruse; that IT Corporation in fact had no interest in the acquisition of the Robert tract until after it read its own feasibility study (sometime between September 29 and September 25, 1979); and that its communications with the Roberts were designed to do nothing more than determine the “price and availability” of the Robert tract in order that IT Corporation could accurately represent to the State both its “availability” and estimates of land acquisition costs. The Commission finds completely untenable this thesis, in general, and the testimony of Murray Hutchinson, in particular, as to events that led to the execution of an option agreement with an effective date of September 25, 1979. The testimony of Mr. Hutchinson that he did not contemplate recommending to IT Corporation the execution of the option agreement or even the acquisition of the proposed tract of land until after September 21, 1979— when he read the feasibility study for the first time — and yet somehow prior to September 25, 1979 — is unacceptable to the point of being ludicrous.
When this matter was previously before this Court, we held:
IT Corporation timely submitted its feasibility study by September 20, 1979. On September 25, 1979, IT Corporation’s real estate option around which this dispute centers became effective. Because, however, IT Corporation was not paid by the State for its services until October 9, 1979, it was still a state employee on the *258 date the real estate option became effective, and did, therefore, acquire a “personal substantial economic interest” in violation of Section 1112.
We adhere to that view. During the course of the public hearing, Mr. and Mrs. Robert and Mr. Sotile testified that ITC, through its representatives, actively-pursued acquisition of the “Robert tract” contemporaneously with its performance of the study, and that there was no indication that ITC’s interest in the Robert tract was merely in the performance of the study. We conclude that the record establishes that ITC was actively negotiating with the Roberts, directly and through their attorney, with a view toward its own acquisition of the Robert tract prior to the “Study Report” of September 1979. ITC’s targeting of the Robert tract in the “Study Report” constitutes “participation” (by recommendation) in a “transaction” (the selection of a suitable construction site for a model regional hazardous waste facility) in which ITC had a substantial economic interest (as shown by the “negotiations” to acquire the Robert tract). We find that these negotiations for an option to acquire the Robert tract constitute an “economic interest” in the subject tract of land.
We agree with the Commission that ITC was in violation of Section 1112A of the Code in that ITC, as a “state employee,” participated in a “transaction involving the state” in which it had “a personal substantial economic interest.”
It has also been established that ITC violated Section 1118 of the Code. The purpose of Section 1118 is to prohibit giving something of “economic value” to a public servant which the public servant is proscribed from receiving by other sections of the Code. In the instant case, Research Associates and Ned Cole were prohibited by Section 1113 of the Code from rendering services for compensation to any person from whom such employee would be prohibited from receiving a gift. The Code prohibits public servants from receiving any “thing of economic value as a gift” from any person who either (1) has a contract or other business or financial relationship with the public servant’s agency, or (2) has “interests” which may be substantially affected by the public servant’s performance or nonperformance of official duties.
At the time ITC and Research Associates entered into their arrangement of June 17, 1979, and continuing thereafter until final payment was made by ITC to Research Associates and Ned Cole for services rendered, ITC had or was seeking to obtain contractual relationships with DNR (the “agency” of both Research Associates and Ned Cole), and had “interests” which would have been and were substantially affected by performance or nonperformance, of official duties of both Cole and Research Associates as employees of the DNR.
The Commission found that this conduct was not “a mere technical violation” of the Governmental Ethics Code. The purpose of Section 1118 of the Code is to prohibit persons seeking to obtain or having governmental contracts or having “interests” substantially affected by the performance of certain governmental employees, from attempting, through payments of something of economic value, to curry favor, gain preferential treatment, or be excused from substandard performance by reason of prohibited payment. In the instant case, the Commission concluded that “from the inception of, on, and through the occurrence of every material event, IT Corporation made promises of payment or was contractually bound to make payments— and indeed made payments—to Research Associates and to Ned Cole at times when Ned Cole, through Research Associates, was not only contractually bound to the Department of Natural Resources, but was fundamentally and comprehensively involved, virtually to the exclusion of the other Department of Natural Resources staff, in the development and management of the Department’s fledgling ‘Hazardous Waste Disposal Management Program.’ ”
We agree with the conclusion of the Commission that ITC violated Section 1118 of the Code. The record establishes that *259 ITC did make payments to Research Associates in the amount of $53,836.00 at a time when ITC was under contract to the DNR to assist in the development of Louisiana’s hazardous waste disposal program. Thus, the receipt by Research Associates of these payments from a governmental contractor was prohibited by Section 1113 B(4) of the Code. Inasmuch as the receiving of payments by Research Associates from ITC constituted a violation of Section 1113 B(4), the making of the payments by ITC was a violation of Section 1118 of the Code.
Upon concluding that ITC had violated Sections 1112 A and 1118 of the Code, the Commission, in the exercise of its authority to enforce provisions of the Code by the levying of fines, imposed the maximum fine on ITC for each violation. In addition, the Commission ordered ITC to repay to the Treasury of the State of Louisiana the contract sum of $375,598.00. As stated above, we agree with the imposition of the fines, but we believe the Commission was in error in ordering the return of the contract price. The Code does not expressly grant to the Commission the authority to order the return of the contract price. The Code merely grants to the Commission the authority to seek recovery of damages by a separate civil action in district court.- See Section 1121 G of the Code. That is not to say that remedial action may not be initiated by the State or the proper governmental agency.
In its answer to the appeal, the Commission seeks a modification of that portion of our initial decision in this matter which prohibited the Commission from attempting to set aside the permit issued to ITC. In that decision, we fully discussed and decided this issue. Commission on Ethics for Public Employees v. IT Corporation, supra at 703. We adhere to the conclusion that “the permits involved in this case are ‘lieense[s]’ within the meaning of the Code of Governmental Ethics, and, as such, are immune from either cancellation or rescission by the Commission on Ethics for Public Employees.”
For the foregoing reasons, the order of the Commission is affirmed in part, and vacated and set aside in part. The imposition of the fines for the two violations is allowed to stand and is affirmed; the order requiring the ITC to repay the sum of $375,598.00, the contract sum, is vacated and set aside. Costs to be paid by appellant, ITC.
AFFIRMED IN PART; VACATED AND SET ASIDE IN PART.