**STATE OF LOUISIANA**

**COURT OF APPEAL**

**FIRST CIRCUIT**

**2023 CA 0321**

LOUISIANA BOARD OF ETHICS
IN THE MATTER OF MICHELLE BARNETT

Judgment Rendered: **JAN 2 6 2024**

* * * * * *

On Appeal from
the Ethics Adjudicatory Board
State of Louisiana, Division of Administrative Law
Docket No. 2015-0662

Gregory McDonald, Presiding Administrative Law Judge

* * * * * *

David A. Lowe
Baton Rouge, Louisiana

Counsel for Respondent/Appellant
Michelle Barnett

Tracy M. Barker
David M. Bordelon
Mallory A. Guillot
Agency Attorneys
Baton Rouge, Louisiana

Counsel for Appellee
Louisiana Board of Ethics

* * * * * *

*Miller, J*
*dissents w/ reasons*

**BEFORE: McCLENDON, HESTER, AND MILLER, JJ.**

**McCLENDON, J.**

Michelle Barnett appeals from an Ethics Adjudicatory Board (EAB) decision that found she violated a provision of the Louisiana Code of Governmental Ethics, LSA-R.S. 42:1101, *et seq.* (Ethics Code) and imposed penalties and fines accordingly. After a thorough review of the record, we affirm.

## FACTS AND PROCEDURAL HISTORY[1]

On January 15, 2015, the Louisiana Board of Ethics (BOE) charged Michelle Barnett, an employee of the Louisiana Department of Health and Hospitals (DHH),[2] Office of Behavioral Health (OBH), with receipt of a thing of economic value from Magellan Health Services (Magellan) at a time when her agency had a contractual or other business or financial relationship with Magellan, in violation of LSA-R.S. 42:1111(C)(2)(d). An adjudicatory hearing was held on October 13 and 14, 2022. After the hearing, the EAB issued a decision finding Mrs. Barnett violated LSA-R.S. 42:1111(C)(2)(d) "by receiving one-half of her husband Thomas Barnett's salary for services he provided to Magellan Health Services, Inc. during the period of March 1, 2013, through October 15, 2013, from a prohibited source." For this violation, the EAB fined Mrs. Barnett $1,000.00 under LSA-R.S. 42:1153(B), and assessed penalties against Mrs. Barnett in the amount of $22,053.74 under LSA-R.S. 42:1115(A). Mrs. Barnett filed a "Request and/or Motion for Rehearing and/or Reconsideration" pursuant to LSA-R.S. 49:977.1,[3] which the EAB denied. Pursuant to LSA-R.S. 42:1142(A)(1), Mrs. Barnett appealed directly to this court.[4]

---

[1] We borrow portions of this opinion from this court's previous opinions in **Barnett v. Louisiana Board of Ethics**, 2018-1106 (La.App. 1 Cir. 6/20/19), 280 So.3d 632 (**Barnett I**), and **Louisiana Board of Ethics In the Matter of Michelle Barnett**, 2021-0459 (La.App. 1 Cir. 4/7/22) 2022 WL 1074623 (unpublished) (**Barnett II**).

In **Barnett I**, this court affirmed the EAB's denial of Mrs. Barnett's exception raising the objection of prematurity. Prematurity is determined by the facts existing at the time the suit is filed. **Barnett**, 280 So.3d at 638.

In **Barnett II**, this court concluded that the EAB did not abuse its great discretion in denying Mrs. Barnett's motion *in limine* seeking to preclude the BOE from asserting, alleging, calling any witness to testify, or offering any evidence into the record asserting her agency "was anything other than DHH/OBH[.]" **Barnett II**, 2022 WL 1074623 at *1.

[2] After the events at issue, Act 300 of the 2016 Legislative Session amended and reenacted LSA-R.S. 36:251 to change the name of DHH to the Louisiana Department of Health (LDH). For ease of reference and continuity, we refer to DHH throughout.

[3] Louisiana Revised Statutes 49:959 was redesignated as LSA-R.S. 49:977.1 by Acts 2022, No. 663, § 1.

[4] Any person aggrieved by any action of the EAB may appeal to the First Circuit Court of Appeal. LSA-R.S. 42:1142(A)(1); **Board of Ethics v. Morrow**, 2022-0245 (La.App. 1 Cir. 5/8/23), 369 So.3d 54, 56.

2

## STANDARD OF REVIEW

The Louisiana Administrative Procedure Act (APA) governs the judicial review of an EAB decision. **Louisiana Board of Ethics in re Great Southern Dredging, Inc.,** 2015-0870 (La.App. 1 Cir. 5/27/16), 195 So.3d 631, 634, <u>writ denied sub nom.</u> **Louisiana Board of Ethics in the Matter of Great Southern Dredging, Inc.,** 2016-1208 (La. 10/17/16), 207 So.3d 1063. Judicial review is confined to the record, and, pursuant to LSA-R.S. 49:978.1(G) (formerly LSA-R.S. 49:964(G)),[5] the EAB's decision may be reversed or modified only if substantial rights of the appellant are prejudiced because the findings, inferences, conclusions, or decisions are: (1) in violation of constitutional or statutory provisions; (2) in excess of the agency's statutory authority; (3) made upon unlawful procedure; (4) affected by other error of law; (5) arbitrary, capricious, an abuse of discretion, or a clearly unwarranted exercise of discretion; or (6) not supported and sustainable by a preponderance of evidence as determined by the reviewing court. **Great Southern Dredging, Inc.,** 195 So.3d at 634.

As noted above, Mrs. Barnett appealed the decision of the EAB directly to this court pursuant to LSA-R.S. 42:1142(A)(1). This court considered the direct appeal of a decision of the Board of Ethics in **Schmitt v. Louisiana Board of Ethics,** 2000-0341 (La.App. 1 Cir. 3/28/01), 808 So.2d 524, before concluding:

> Pursuant to [LSA-]R.S. 49:964(G)(6), we have made our own determinations of fact and conclude the evidence supports a finding that Mr. Schmitt violated [LSA-]R.S. 42:1112(B)(1). In conducting this review, we have given due regard to the Board's determination of credibility issues. The findings of fact and conclusions of law set forth in the Board's . . . written reasons for judgment are correct.

**Schmitt,** 808 So.2d at 525. Consistent with **Schmitt,** subsequent jurisprudence in which a party appealed a decision of the Board of Ethics directly to this court reflects that this court has made its own determinations of fact in such situations. <u>See</u> **In re Ferrara Fire Apparatus, Inc.,** 2003-0446 (La.App. 1 Cir. 12/31/03), 868 So.2d 762, 764 ("Pursuant to our standard of review, we have made our own determinations of fact and conclude the evidence supports a finding that FFA violated LSA-R.S. 42:1117"); **In re Jefferson Alliance, Inc.,** 2002-0335 (La.App. 1 Cir. 2/14/03), 841 So.2d 15, 17, <u>writ denied</u>, 2003-

---

[5] Louisiana Revised Statutes 49:964 was redesignated as LSA-R.S. 49:978.1 by Acts 2022, No. 663, § 1.

3

1136 (La. 6/20/03), 847 So.2d 1233 ("Employing this standard of review, we conclude that the findings of fact and conclusions of law set forth in the Board's written reasons for judgment are correct"). Thus, as the reviewing court, we make our own determinations and conclusions of fact by a preponderance of evidence based upon our own evaluation of the record reviewed in its entirety, though due regard must be given to the agency's determination of credibility issues. On legal issues, we give no special weight to the findings of the administrative tribunal, but conduct a *de novo* review of questions of law and render judgment on the record. See **Schmitt v. Louisiana Board of Ethics**, 2000-0341 (La.App. 1 Cir. 3/28/01), 808 So.2d 524, 525.[6]

## LAW

The Ethics Code was enacted to establish ethical standards for the conduct of elected officials and state employees to protect against conflicts of interest between their private interests and the duties of their positions. LSA-R.S. 42:1101(B); **Great Southern Dredging, Inc.**, 195 So.3d at 634. A conflict of interest is a situation that would require an official to serve two masters, presenting a potential, rather than an actuality, of wrongdoing.[7] **In re Ferrara Fire Apparatus, Inc.**, 2003-0446 (La.App. 1 Cir. 12/31/03), 868 So.2d 762, 765. The Ethics Code prohibits not only actual conflicts of interest, but also the appearance of impropriety by preventing situations that create the perception of conflicts of interest. The BOE is responsible for investigating and issuing charges for violations of the Ethics Code. See LSA-R.S. 42:1141(C). The EAB then conducts a hearing to determine whether any violations have occurred. See LSA-R.S. 42:1141(C); **Louisiana Board of Ethics**, 2017-0313 (La.App. 1 Cir. 11/16/17), 236 So.3d 593, 598, writ denied sub nom., **Louisiana Board of Ethics in Matter of Dumas**, 2018-0132 (La. 3/9/18), 238 So.3d 457. Any public servant or other person who is to be the subject of a hearing shall be given written notification of the pending charges

---

[6] As noted in the Louisiana Practice Series, Louisiana Civil Appellate Procedure, § 10:155, courts have conflicting interpretations of LSA-R.S. 49:964(G)(6), now designated as LSA-R.S. 49:978.1(G)(6), regarding the deference owed by the appellate court to the factual findings of the trial court. However, given the procedural posture of this matter, we need not consider that issue.

[7] Because violations of the Ethics Code can result in the assessment of fines and/or penalties, they are penal in nature and, therefore, must be strictly construed. Additionally, any doubt in the construction of a penal statute must be resolved with lenity and in favor of the person subject to the fine or penalty. **Louisiana Board of Ethics v. Randolph**, 2013-1509 (La.App. 1 Cir. 8/21/14), 2014 WL 4198343, *3 (unpublished), writ denied, 2014-1987 (La. 11/21/14), 160 So.3d 974.

4

and of the time and place such hearing is to be held, not less than sixty days prior to the date set for the hearing. See LSA-R.S. 42:1141.4(A)(1).

In this matter, the BOE charged Mrs. Barnett with violating LSA-R.S. 42:1111(C)(2)(d).[8] Louisiana Revised Statutes 42:1111(C)(2)(d) provides, in pertinent part:

> (2) No public servant and no legal entity in which the public servant exercises control or owns an interest in excess of twenty-five percent, shall receive any thing of economic value for or in consideration of services rendered, or to be rendered, to or for any person during his public service unless such services are:
>
> . . .
>
> (d) Neither performed for nor compensated by any person from whom such public servant would be prohibited by R.S. 42:1115(A)(1) or (B) from receiving a gift.

This provision of the Ethics Code prohibits a public servant from receiving anything of economic value for services rendered to a person from whom he would be prohibited from receiving a gift pursuant to LSA-R.S. 42:1115(A)(1) or (B) (for ease of reading hereinafter, the "prohibited gift statute").[9] See **In re Schneckenburger**, 518 So.2d 497, 499 (La. 1988). A person from whom a public servant is prohibited from receiving a gift under the terms of the prohibited gift statute is sometimes referred to as a "prohibited source." See **Dumas**, 236 So.3d at 598. Thus, the elements of a violation of the

---

[8] The purpose of the prohibition is to prevent persons seeking to obtain or having governmental contracts or having interests substantially affected by the performance of certain governmental employees from attempting, through payments of something of economic value, to curry favor, gain preferential treatment, or be excused from substandard performance by reason of prohibited payment. See **Great Southern Dredging, Inc.**, 195 So.3d at 634-35, citing **IT Corp. v. Commission on Ethics for Public Employees**, 453 So.2d 251, 258 (La.App. 1 Cir. 1984), affirmed, 464 So.2d 284 (La. 1985) (interpreting LSA-R.S. 42:1118, the predecessor to LSA-R.S. 42:1111).

[9] Louisiana Revised Statutes 42:1115 provides:

> A. No public servant shall solicit or accept, directly or indirectly, any thing of economic value as a gift or gratuity from any person or from any officer, director, agent, or employee of such person, if such public servant knows or reasonably should know that such person:
>
> > (1) Has or is seeking to obtain contractual or other business or financial relationships with the public servant's agency, or
> >
> > (2) Is seeking, for compensation, to influence the passage or defeat of legislation by the public servant's agency.
>
> B. No public employee shall solicit or accept, directly or indirectly, anything of economic value as a gift or gratuity from any person or from any officer, director, agent, or employee of such person, if such public employee knows or reasonably should know that such person:
>
> > (1) Conducts operations or activities which are regulated by the public employee's agency.
> >
> > (2) Has substantial economic interests which may be substantially affected by the performance or nonperformance of the public employee's official duty.

prohibited gift statute are (1) a public servant, (2) accepting, directly or indirectly, a thing of economic value, (3) from persons considered a "prohibited source." See **Dumas**, 236 So.3d at 598.

Thus, in order to find Mrs. Barnett violated LSA-R.S. 42:1111(C)(2)(d), we must find, based on the record before us, that (1) Mrs. Barnett was a public servant, (2) Mrs. Barnett received a thing of economic value, and (3) Mrs. Barnett's receipt of a thing of economic value was for or in consideration of services rendered to a person considered a prohibited source as defined in the prohibited gift statute. In the context of the Ethics Code, "Person" is defined as "an individual or legal entity other than a governmental entity, or an agency thereof." LSA-R.S. 42:1102(16). "Service" means "the performance of work, duties, or responsibilities, or the leasing, rental, or sale of movable or immovable property." LSA-R.S. 42:1102(20.1). While the prohibited gift statute provides several definitions of a prohibited source, the definition which is pertinent to this matter is any person that the "public servant knows or reasonably should know. . . [h]as or is seeking to obtain contractual or other business or financial relationships with the public servant's agency." LSA-R.S. 42:1115(A)(1); See **Dumas**, 236 So.3d at 601.

## THE CHARGES

In sum, the charges alleged that Mrs. Barnett began working for DHH in April 2011; that Mrs. Barnett was promoted to a Program Manager 2 position within DHH-OBH in September 2011, specifically as manager of the Electronic Behavioral Health Record System (EBHRS); that Mrs. Barnett's responsibilities as manager of the EBHRS included managing an effective and ongoing data exchange with the Statewide Management Organization (SMO); that the SMO managed behavioral health services for Medicaid and Non-Medicaid eligible populations served by OBH; that Magellan Health Services (Magellan) was selected as the SMO in November 2011; that Mrs. Barnett's husband, Thomas Barnett, was hired by Magellan in July 2012 as a Senior Network Business Analyst; that Mr. Barnett's job duties included analysis and production of reports in support of the Magellan provider network for OBH, which reports were prepared and issued to DHH-OBH; that Mrs. Barnett's job duties were reclassified in February of 2013 to provide that she would be responsible for managing the effective data exchange with

6

the SMO in order to manage and evaluate the SMO, and that she would work with a team that included SMO staff to create reports and summaries based on data submitted by Magellan to measure the performance of the SMO; that in October 2013, Mrs. Barnett was asked to work on a Request for Proposal for the SMO, and in connection therewith, disclosed that her husband worked for Magellan; and that, following Mrs. Barnett's disclosure, DHH moved Mrs. Barnett laterally to another Program Manager 2 position not involved with the Magellan contract. The charges concluded:

> Based on the foregoing facts, Michelle Barnett violated [LSA-R.S. 42:1111(C)(2)(d)] by virtue of her receipt of a thing of economic value[,] for services provided to Magellan, by her husband, Tom Barnett, at a time when she was employed with the DHH/OBH, and at a time Magellan had a contractual or other business or financial relationship with the DHH/OBH.

## THE HEARING

During the adjudicatory hearing, witness testimony was taken from Karen Stubbs,[10] then the Assistant Secretary of OBH, and Mr. and Mrs. Barnett. The BOE offered numerous exhibits into evidence, which the EAB admitted over Mrs. Barnett's objections. The BOE's exhibits included excerpts of Mrs. Barnett's DHH personnel file; Mr. and Mrs. Barnett's marriage license; excerpts of Mr. Barnett's Magellan personnel file, including his employment history, an Employee Statement of Confidentiality and Conflict of Interest form, and Financial Disclosure Statements; excerpts from DHH's July 8, 2011 Request for Proposal seeking bids to serve as SMO for the Louisiana Behavioral Health Partnership; the contract between DHH-OBH and Magellan; the amendment to the DHH-OBH and Magellan contract; the December 10, 2013 letter from the DHH Bureau of Legal Services to the BOE reporting Mrs. Barnett's "Possible Non-Compliance" with the Code; and Mrs. Barnett's Conflict of Interest Statement. Mrs. Barnett also offered numerous exhibits into evidence, including the BOE's charges filed against her; position descriptions and related charts; DHH-OBH's offer of employment to Mrs. Barnett, dated February 29, 2012; and documents reflecting Mr. Barnett's salary and his W-2 forms from the relevant time period.

---

[10] Karen Stubbs Church is referred to as Karen Stubbs, her name at the time of the events herein.

Mrs. Barnett's employment with DHH-OBH

Ms. Stubbs testified she was Mrs. Barnett's supervisor in 2013. Ms. Stubbs reviewed the job descriptions and organizational charts the BOE offered as evidence and testified that the documents reflected Mrs. Barnett's duties for OBH involved the SMO. Ms. Stubbs recalled hearing Mrs. Barnett say that Mr. Barnett worked for Magellan prior to her formal disclosure, but as a newer employee at that time, she assumed the situation had already been "vetted[.]" Ms. Stubbs further testified that after Mrs. Barnett's formal disclosure, she was transferred out of OBH in October or November 2013, based on the conflict of interest.

During Mrs. Barnett's testimony, she adamantly denied the accuracy of the BOE's charges against her. For example, while the BOE's charges alleged Mrs. Barnett began working for DHH-Medicaid as a Program Manager 1 in April 2011, Mrs. Barnett testified that she began working for DHH-Medicaid as a Program Manager 2 in April 2011. Mrs. Barnett's testimony on this point was corroborated by one of the BOE's exhibits. Similarly, the BOE's charges alleged Mrs. Barnett began working for DHH-OBH as a Program Manager 2 in September 2011, but Mrs. Barnett also testified that she began working for DHH-OBH as a Program Manager 2 on March 1, 2012. Mrs. Barnett's testimony on this issue was corroborated by DHH-OBH's February 29, 2012 offer of employment to Mrs. Barnett.

Mrs. Barnett also testified that the job descriptions and organizational charts offered by the BOE and reviewed by Ms. Stubbs were so inaccurate they "floored" her. In particular, the excerpts of Mrs. Barnett's DHH personnel file included two "Position Description" forms with attached "Duties and Responsibilities" documents containing "Occupational Summary" sections. The first "Position Description" form showed an effective date of September 22, 2011. The accompanying "Occupational Summary" stated, in pertinent part, "OBH is the lead agency of the Louisiana Behavioral Health Partnership, a new behavioral health managed coordinated system of care (CSOC) involving five state agencies, contracted through a Statewide Management Organization (SMO)." The Occupational Summary further provided that, as the manager of the Electronic Behavioral Health Record System (EBHRS), Mrs. Barnett's responsibilities would

8

include managing an effective and ongoing data exchange with the SMO. Mrs. Barnett pointed out that she did not sign the first Position Description form and disputed the accuracy of the Occupational Summary.

The second Position Description form showed an effective date of February 23, 2013, and contained a note that read "Business Reorg[.]" The second Position Description was marked to indicate that an organizational chart and a "Duties and Responsibilities" document were attached, and the revised Occupational Summary provided that Mrs. Barnett would serve as the "Clinical Services Quality/Performance Accountability Branch Program Manager[.]" The Occupational Summary stated that Mrs. Barnett would be "responsible for the development, implementation[,] and ongoing management of the OBH Data Mart/Business Intelligence (DM/BI) system for clinical services data, analyses of these data, and reporting of quality and performance metrics derived from the data." The Occupational Summary further specified that the "DM/BI is a critical resource" created from varying data sources, including the SMO, and "used by the OBH Business Intelligence section to manage and evaluate the SMO and to monitor and evaluate the statewide network of behavioral health services and providers." Mrs. Barnett conceded she signed the second Position Description on October 31, 2012, but contested the contents of the Occupational Summary.

In disputing the BOE's allegations that she worked with the SMO, Mrs. Barnett asserted that she worked in the Analytics unit of the Business Intelligence section, which was a section of the Health Plan Management section of OBH. According to Mrs. Barnett, the Analytics branch of the Business Intelligence section involved the "traditional" role of OBH in dealing with local governmental entities, while the other branch dealt with the SMO. Mrs. Barnett offered a June 12, 2012 Memorandum and attached organizational charts in support of her testimony. Mrs. Barnett also offered a personnel evaluation that listed Mrs. Barnett's job duties and did not contain any reference to the SMO.

Mr. Barnett's employment with Magellan

Mr. Barnett was the second witness called at the hearing. Mr. Barnett testified Mrs. Barnett knew he was applying to work for Magellan. He testified, and his employment

records confirmed, that he began working for Magellan in July of 2012[11] as a "Senior Network Business Analyst[.]" Regarding his duties while employed by Magellan, Mr. Barnett described receiving data regarding provider information, such as location and credentials, and "produc[ing] reports for the provider network," which included "mental health professionals, social workers, psychologists, [and] psychiatrists[.]" Mr. Barnett testified he placed his reports in a directory, but denied being aware whether the reports were transmitted to Mrs. Barnett's agency.

Mr. Barnett identified the Financial Disclosure Statements he completed for the years 2012, 2013, and 2014, all three of which were executed on May 10, 2015. On the Financial Disclosure Statements, Mr. Barnett indicated he was the spouse of a public servant, specifically Michelle Barnett, who worked at "DHH/OBH[.]" Mr. Barnett identified "Transactions Involving [the] Public Servant's Agency" as "Produc[ing] reports on the provider network, showing provider locations, levels of care, specialties, ethnicity, access, etc." and identified the "Name of Business" as "Magellan Health Services[.]"

> The job description from Mr. Barnett's personnel file provided:
>
> Provides analysis and produces reports in support of Magellan provider network for the Louisiana Behavioral Health Partnership (LBHP). Contracting and credentialing reports, GEO Access reports monitoring provider network adequacy, CSOC reports, prescriber sufficiency reports, ad hoc reports for presentation to DHH/OBH, and contractually-required quarterly reports. Work with people in other department members (sic) to solve problems and meet goals.

Mr. Barnett's employment records also contained an undated "Employee Statement of Confidentiality and Conflict of Interest" that began, "I understand that as an employee of Magellan Health Services or any of its affiliates . . ."

Mr. Barnett testified that, when reviewing his W-2 forms several months prior to the hearing, he realized they were issued by "Magellan, HRSC, Inc." (Magellan HRSC), Mr. Barnett testified that seeing his W-2 forms were issued by Magellan HRSC "made a lot of things clear to [him] that were confusing before[,]" explaining that he knew he

---

[11] The portion of Mr. Barnett's employment records referenced is a form titled "Work Experience[.]" The Work Experience form identifies Mr. Barnett's work history prior to beginning employment at Magellan, as well as his employment with Magellan, under the titles "Other Employer[,]" "Other Function[,]" and "Achievements[.]" The final entry on the Work Experience form is explicitly marked as Mr. Barnett's "Current Job" and identifies Mr. Barnett's "Other Employer" as "Magellan Health Services" beginning in July 2012. Accordingly, it is plain from reviewing the form in its entirety that this entry refers to the employment at issue, regardless of the use of the title "Other Employer."

worked for a company named "Magellan," but had been told he "didn't work for the SMO." He stated that at the time he identified Magellan Health Services as his employer on the Financial Disclosure Statements, he "didn't know the distinction."

Regarding Mr. Barnett's employment with Magellan, Mrs. Barnett stated she sought advice from her supervisors and was told there were no issues with him applying for that position. However, Mrs. Barnett did not seek an advisory opinion on the issue. She stated she was not required to take ethics training until Mr. Barnett was already working for Magellan, and when she did take ethics training, the term "agency" was defined as the smallest identifiable group or unit within which an employee worked, which she believed for her would have been the Analytics branch of the Business Intelligence unit. Thus, Mrs. Barnett did not believe there was any problem. Mrs. Barnett further speculated that the BOE's charges were brought against her in retaliation for a civil suit she filed after being passed over for a promotion in favor of a candidate with much less experience.

## DISCUSSION

Having conducted a thorough review of the record in its entirety, formed our own conclusions of fact, and considered all legal issues *de novo*, we find that the EAB correctly determined Mrs. Barnett violated LSA-R.S. 42: 1111(C)(2)(d) "by receiving one-half of her husband Thomas Barnett's salary for services he provided to Magellan Health Services, Inc. during the period of March 1, 2013, through October 15, 2013, from a prohibited source[,]" for the reasons that follow.

### *Public Servant*

Pursuant to LSA-R.S. 42:1102(19), "Public servant" means a public employee or an elected official. It is undisputed that as an employee of DHH, Mrs. Barnett was a "public servant" for purposes of the Ethics Code.

### *Receipt of a Thing of Economic Value*

Louisiana Revised Statutes 42:1102(22)(a) defines a "[t]hing of economic value" as "money or any other thing having economic value." In this matter, the BOE alleged, and the EAB found, that Mrs. Barnett received a thing of economic value because she

11

received one-half of Mr. Barnett's salary by virtue of the community property regime created by Mr. and Mrs. Barnett's marriage. We agree.

This court considered a similar situation in **Great Southern Dredging, Inc.**, 195 So.3d at 634. In **Great Southern Dredging, Inc.**, the spouses were subject to a community property regime, and the public servant's spouse owned 51% of a company that subcontracted with the public servant's agency. **Great Southern Dredging, Inc.** explained that under LSA-C.C. art. 2338, property acquired during the existence of the legal regime through the effort, skill, or industry of either spouse is community property. Further, under LSA-C.C. art. 2336, "[e]ach spouse owns a present undivided one-half interest in the community property" during the existence of the community property regime. See **Great Southern Dredging, Inc.**, 195 So.3d at 636-37. Thus, by virtue of the community property regime, the public servant in **Great Southern Dredging, Inc.** owned an undivided one-half interest in 51 of the 100 shares of the subcontracted company. As that exceeded 25% of the ownership interest, this court affirmed the EAB's determination that the public servant violated LSA-R.S. 42:1111(C)(2)(d). See **Great Southern Dredging, Inc.**, 195 So.3d at 638-39.

In this matter, it is undisputed that at all relevant times, Mrs. Barnett was married to Mr. Barnett, and the two were subject to a community property regime. Thus, pursuant to LSA-C.C. arts. 2336 and 2338 and **Great Southern Dredging, Inc.**, 195 So.3d at 634, 638-39, Mr. and Mrs. Barnett each own an undivided one-half interest in Mr. Barnett's compensation during the existence of their marriage. Accordingly, the EAB correctly determined that Mrs. Barnett received a thing of economic value, *i.e.*, one-half of Mr. Barnett's salary, by virtue of the community property regime.

We note Mrs. Barnett's third assignment of error argues there was no violation of LSA-R.S. 42:1111(C)(2)(d) because no legal entity received a thing of economic value, and that the EAB's finding of a violation of LSA-R.S. 42:1111(C)(2)(d) was based on an erroneous conclusion that her marriage to Tom Barnett was a "legal entity" under Louisiana law. However, these arguments conflict with the plain language of LSA-R.S. 42:1111(C)(2), which explicitly provides that "[n]o public servant *and* no legal entity in which the public servant exercises control or owns an interest in excess of twenty-five

12

percent" (emphasis added) shall receive any thing of economic value from a prohibited source. This language prohibits both the receipt of payments by a public servant, and the receipt of payments by entities in which a public servant exercises control or has the requisite ownership interest. See **Great Southern Dredging, Inc.,** 195 So.3d at 635. Stated differently, the prohibition applies to public servants in their individual capacity regardless of whether a legal entity is involved. This assignment of error lacks merit.

### *For or In Consideration of Services Rendered to a Prohibited Source*

Having found that Mrs. Barnett was a public servant who received a thing of economic value, we next determine whether her receipt of a thing of economic value was for or in consideration of services rendered to a prohibited source. As stated above, LSA-R.S. 42:1111(C)(2)(d) prohibits public servants from receiving any thing of economic value for services rendered to a person from whom he would be prohibited from receiving a gift under LSA-R.S. 42:1115(A)(1) or (B). See **In re Schneckenburger,** 518 So.2d at 499. It is undisputed that Magellan had a contractual relationship with OBH, and that Mr. and Mrs. Barnett were aware of same. Thus, it appears to be clear that Magellan was a prohibited source pursuant to LSA-R.S. 42:1115(A). See **Dumas,** 236 So.3d at 601. However, in various assignments of error, Mrs. Barnett challenges the EAB's findings that OBH was her agency and that Mr. Barnett's salary was paid for or in consideration of services rendered to a prohibited source.

We first address the identity of Mrs. Barnett's agency. For purposes of the Ethics Code, LSA-R.S. 42:1102(2)(a) provides the following definition of "[a]gency":

> [A] department, office, division, agency, commission, board, committee, or other organizational unit of a governmental entity. For purposes of this Chapter, "agency of the public servant" and "his agency" when used in reference to the agency of a public servant shall mean:
>
>> (i) For public servants in the twenty principal departments of the executive branch of state government, *the office in which such public servant carries out his primary responsibilities*, except that in the case of the secretary, deputy secretary, or undersecretary of any such department and officials carrying out the responsibilities of such department officers it shall mean the department in which he serves; and except that in the case of public servants who are members or employees of a board or commission or who provide staff assistance to a board or commission, it shall mean the board or commission.

(Emphasis added).

13

Pursuant to LSA-R.S. 36:4(A)(5), DHH is one of the principal departments of the executive branch of state government.[12] Louisiana Revised Statutes 36:251(B) provides, in part, that DHH, "**through its offices and officers**, shall be responsible for the development and providing of health and medical services for the prevention of disease for the citizens of Louisiana." (Emphasis added). Louisiana Revised Statutes 36:251(C)(1)[13] further provides, in pertinent part, that DHH:

> [S]hall be composed of the executive office of the secretary, the office of management and finance, the office of public health, *the office of behavioral health*, the office for citizens with developmental disabilities, the office of aging and adult services, the office on women's health and community health, and such other offices as shall be created by law.

(Emphasis added).

As a public servant employed by DHH, Mrs. Barnett's agency was "the office in which such public servant carries out his primary responsibilities" pursuant to LSA-R.S. 42:1102(2)(a)(i). Further, LSA-R.S. 36:251(C)(1) explicitly identifies OBH as an office of DHH. Laws on the same subject matter must be interpreted *in pari materia*, or in reference to each other. See LSA-C.C. art. 13; **Acurio v. Acurio**, 2016-1395 (La. 5/3/17), 224 So.3d 935, 938. Considering the plain language of these statutes *in pari materia*, it is plain that Mrs. Barnett's agency was OBH. While we note that Mrs. Barnett's seventh assignment of error contends the Business Intelligence Section should be considered her agency, because the BOE's training materials define a public servant's agency as the "the smallest unit" of the governmental entity to which the public servant belonged, such a finding would directly contradict the plain language of LSA-R.S. 42:1102(2)(a), LSA-R.S. 36:4(A)(5), and 36:251(B) and (C). Thus, this assignment of error lacks merit, and the EAB correctly determined that OBH was Mrs. Barnett's agency.[14]

---

[12] Louisiana Constitution of 1974, article II, § 1 provides that "(T)he powers of government of the state [of Louisiana] are divided into three separate branches: legislative, executive, and judicial." LSA-Const. of 1974, art. IV provides for the executive branch of state government and provides, in pertinent part, in Section 1(B) that "all offices, agencies, and other instrumentalities of the executive branch... shall be allocated according to function within not more than twenty departments". This constitutional mandate is satisfied in LSA-R.S. 36:4. **Save Our Wetlands, Inc. v. Department of Environmental Quality**, 2000-2809 (La.App. 1 Cir. 2/15/02), 812 So.2d 746, 747, writ denied, 2002-1230 (La. 8/30/02), 823 So.2d 953. DHH is listed as LSA-R.S. 36:4(A)(5) in the listing of the executive branch departments.

[13] Louisiana Revised Statutes 36:251(C)(1) was amended pursuant to Section 1 of Act No. 676 of the 2022 Legislative session to provide for the creation of the office on women's health and community health.

[14] We note that Mrs. Barnett cites several EAB advisory opinions in support of this argument. However, advisory opinions are explicitly based solely on the facts as set forth therein, and the facts in this matter are distinguishable from the facts presented in the advisory opinions Mrs. Barnett relies on. Further, while the advisory opinions of a board or commission have been recognized as persuasive authority, like attorney

14

We next consider whether Mr. Barnett's salary was paid for or in consideration of services rendered to a prohibited source. In Mrs. Barnett's second assignment of error, she contends the EAB erred in finding that Mr. Barnett was employed by a prohibited source, because he was not actually employed by the Magellan entity that served as the SMO. Rather, Mrs. Barnett argues her husband's W-2 forms and certain other documents show he was employed by "Magellan, HRSC, Inc." (Magellan HRSC), which she contends is a legal entity entirely distinct from Magellan SMO. In support of her position that Magellan HRSC is a distinct legal entity, Mrs. Barnett argues the BOE failed to put forth affirmative evidence establishing that Magellan HRSC is an affiliate of SMO Magellan. Mrs. Barnett also relies on her husband's testimony that Magellan HRSC and the Magellan entity that served as the SMO had different employer identification numbers, different tax identification numbers, different boards of directors, and were domiciled in different states.

As set forth above, in the context of the Ethics Code, "Service" means "the performance of work, duties, or responsibilities." LSA-R.S. 42:1102(20.1). Mr. and Mrs. Barnett both believed Mr. Barnett worked directly for Magellan, in its capacity as the SMO, until several months before the hearing, when Mr. Barnett noticed the name "Magellan, HRSC, Inc." on his W-2 forms. Mr. Barnett's description of the reports he produced for Magellan were consistent with the stated purpose of the SMO, and his job description explicitly referenced the Louisiana Behavioral Health Partnership and OBH. Further, Mr. Barnett's 2012, 2013, and 2014 Financial Disclosure Forms repeatedly identified "Magellan Health Services" as his employer, identified "DHH/OBH" as Mrs. Barnett's employer, and reflected that Mr. Barnett's "Transactions Involving" Mrs. Barnett's "Agency" included the "[production of] reports on the provider network[.]" Moreover, and most significantly, even though Mr. and Mrs. Barnett testified that at the time of the hearing, they believed he worked for Magellan HRSC based on the W-2s, at no point did Mr. or Mrs. Barnett deny that they understood the work Mr. Barnett performed while

---

general opinions, see **Duplantis v. Louisiana Bd. of Ethics**, 2000-1750 (La. 3/23/01), 782 So.2d 582, 590, n.7, and **Louisiana Board of Ethics v. Holden**, 2012-1127 (La.App. 1 Cir. 6/25/13), 121 So.3d 113, 117, n.7, such opinions are "are merely advisory and not binding." See **City of New Orleans v. Board of Directors of Louisiana State Museum**, 98-1170 (La. 3/2/99), 739 So.2d 748, 753, n.11.

15

employed at Magellan was to benefit Magellan in service to its contract to serve as the SMO to OBH.

Based on the record before us, it is clear that, notwithstanding any legal distinction that may exist between Magellan SMO and Magellan HRSC, an actual relationship existed between the two entities, and Mr. Barnett provided services in furtherance of Magellan's contract with OBH. Consequently, regardless of whether Mr. Barnett's services and/or salary passed through another entity, his salary was paid for or in consideration of services rendered to Magellan, in its capacity as the SMO. The provisions of LSA-R.S. 42:1111(C)(2)(d) prohibit the receipt of something of economic value "for or in consideration of services rendered" to a prohibited source, not "from" a prohibited source, and the services in question were clearly rendered "for or in consideration of services rendered" to a prohibited source. Moreover, we note that, under the plain language of LSA-R.S. 42:1111(C)(2)(d), there is no requirement that the public servant have any supervisory authority, or any interaction at all, with the prohibited source. Thus, whether Mrs. Barnett's job duties involved the SMO is immaterial to this analysis. Having thoroughly reviewed the record before us and considering the same in light of the applicable law, we find the EAB properly determined that Mrs. Barnett's receipt of one-half of Mr. Barnett's salary was for or in consideration of services rendered to a prohibited source.

Finally, we address the EAB's finding that Mrs. Barnett was in violation of LSA-R.S. 42:1111(C)(2)(d) during the period of March 1, 2013, through October 15, 2013, from a prohibited source. As the EAB correctly found, it was not necessary for the BOE to prove Mrs. Barnett directly managed Magellan or worked on the SMO in order to prove a violation of LSA-R.S. 42:1111(C)(2)(d). Thus, it would appear that Mrs. Barnett was in violation from the beginning of Mr. Barnett's employment with Magellan, on July 1, 2012, through October 15, 2013. However, the EAB's discussion of the fines and penalties imposed on Mrs. Barnett under LSA-R.S. 42:1153(B) and LSA-R.S. 42:1155(A)[15] makes

---

[15] Louisiana Revised Statutes 42:1153(B) provides:

> Upon a determination that any public employee or other person has violated any provision of any law within the jurisdiction of the Board of Ethics except violations of the Campaign Finance Disclosure Act which shall be governed by Chapter 11 of Title 18 of the Louisiana

16

clear that the adjustment to the date the violation began was made in consideration of the evidence reflecting that the violation was unintentional. Specifically, the EAB's discussion states, in pertinent part:

> In considering the amount of a fine to impose [under LSA-R.S. 42:1153(B),] the EAB considered that [Mrs. Barnett] recommended that her husband apply to work for Magellan. [Mrs. Barnett] also sought clearance for working in OBH before her husband was hired by Magellan from at least two higher level DHH authorities. . . [Mrs. Barnett] told her new supervisor, Karen Stubbs, about her husband's employment with Magellan before DHH asked its employees to complete a *Conflict of Interest Form*; [Mrs. Barnett] disclosed her husband's employment with Magellan on the form; and [Mrs. Barnett] did not contest her transfer out of OBH after DHH reviewed the disclosure she made on the form. Further, [LSA-R.S.] 42:1170 was amended to require an hour of ethics training for department heads, specifically on contract ethics (in addition to the hour of ethics training required for all public employees annually), beginning January 1, 2014, after the facts that led to this case. . .

> While these facts do not excuse [Mrs. Barnett's] conduct, the EAB considers them important in determining penalties to be imposed.

> Taking these factors into account, the EAB imposes a $1,000 fine against [Mrs. Barnett] for the violation of [LSA-R.S.] 42:1111(C)(2)(d), as authorized by [LSA-R.S.] 42:1153(B).

> . . .

> Thomas Barnett's salary for the entirety of 2013 was $70,571.32. The BOE did not prove the exact date in February, 2013, when [Mrs.] Barnett transitioned to her new position and, accordingly, the EAB will consider the period for economic advantage to be from March 1, 2013, through October 15, 2013. On a pro rata basis, the economic advantage of [Mrs. Barnett's] portion of the Thomas Barnett (sic) salary during the relevant time period was $22,053.74.

> The EAB orders as a penalty under [LSA-R.S.] 42:1155(A) that [Mrs. Barnett] pay the economic advantage of $22,053.74. While the EAB has discretionary authority to award up to one-half of the amount of the economic advantage as an additional penalty under [LSA-R.S.] 42:1155(A), for the reasons set out under the analysis of fines under [LSA-R.S.] 42:1153(B), the EAB declines to do so.

As set forth above, the EAB could have imposed significantly higher fines and penalties on Mrs. Barnett. However, the EAB chose to limit the fine to $1,000.00 and to limit the

---

Revised Statutes of 1950, the Ethics Adjudicatory Board may remove, suspend, or order a reduction in pay, or demotion of the public employee or other person, or impose a fine of not more than ten thousand dollars, or both.

Louisiana Revised Statutes 42:1155(A) provides:

If an investigation conducted pursuant to this Part reveals that any public servant or other person has violated any law within the jurisdiction of the Board of Ethics to his economic advantage, and after an adjudicatory hearing on the matter, the Ethics Adjudicatory Board may order the payment of penalties. Recovery may include, in addition to an amount equal to such economic advantage, penalties not to exceed one half of the amount of the economic advantage. Any appeal of such final decision by the Ethics Adjudicatory Board shall be to the Court of Appeal, First Circuit, pursuant to R.S. 42:1142.

penalties to one-half of Mr. Barnett's salary paid only beginning on March 1, 2013, which was an adjusted start date for Mrs. Barnett's job duties as set forth in the second Position Description, which she signed. Finding this to be a fair and reasonable outcome, we affirm.

Finally, we address the remaining assignments of error raised by Mrs. Barnett. In her first assignment of error, Mrs. Barnett contends that the evidence established that the allegations contained in the BOE's charges were false. While the BOE's charges did contain errors, such as the date Mrs. Barnett began working at OBH, the errors did not prejudice Mrs. Barnett or prevent her from preparing an adequate defense. Additionally, as discussed in detail herein, the allegations which were pertinent to whether a violation of LSA-R.S. 42:1111(C)(2)(d) occurred were satisfactorily proven. This assignment of error lacks merit.

In her fourth assignment of error, Mrs. Barnett contends the EAB erroneously admitted into evidence "inadmissible, unauthenticated, unverified, unidentified documents which were completely contradicted by authenticated, verified, and authenticated documents" over her objections. However, pursuant to LSA-R.S. 49:975.1(1) and La. Admin. Code tit. 52, pt. 1, § 1008, the EAB may admit and give probative effect to evidence that possesses probative value commonly accepted by reasonably prudent men in the conduct of their affairs. Further, under LSA-R.S. 49:975.1(2) and La. Admin. Code tit. 52, pt. 1, § 1008(F), all evidence, including records and documents in the possession of the BOE of which it desires to avail itself, shall be offered and made a part of the record. In this matter, the BOE introduced the affidavit of the executive secretary of the BOE, who attested that she was the custodian of all records, reports, and files of the BOE, and that the exhibits offered were true and correct copies of the BOE's records. Thus, the EAB properly admitted the BOE's exhibits under LSA-R.S. 49:975.1, and this assignment of error lacks merit. Moreover, we note that the testamentary evidence given by Mr. and Mrs. Barnett alone is sufficient to uphold the EAB's finding in this matter, such that even were we to completely discount the exhibits Mrs. Barnett complains of, we would reach the conclusion that Mrs. Barnett violated LSA-R.S. 42:1111(C)(2)(d).

18

Mrs. Barnett's fifth assignment of error argues the EAB improperly weighted Ms. Stubbs' testimony. Having conducted our own review of the record and the EAB's decision and reaching the same conclusion as the EAB, we find no support for this argument. This assignment of error lacks merit.

Mrs. Barnett's sixth assignment of error is that the EAB "erred in allowing the BOE to ignore the First Circuit's 82-02D Exception or any other exceptions and the precedent cases comparable to this case[.]" Mrs. Barnett contends the Board of Ethics for Elected Officials' Advisory Opinion No. 82-02D (82-02D), dated May 17, 1982, provides an exception to LSA-R.S. 42:1111(C)(2)(d) that should have been applied in this matter. In opposition, the BOE contends that it has stopped applying 82-02D, because Act 272 of the 2022 Regular Legislative Session enacted LSA-R.S. 42:1111(C)(5). Review of Ethics Document No. 82-02D and LSA-R.S. 42:1111(C)(5) establishes that Mrs. Barnett is not entitled to the benefit of the exception, regardless of which version would properly apply. The opinion in 82-02D created an exception for a public servant to continue his employment with an entity that was seeking a contractual or other business or financial relationship with the public servant's agency, and LSA-R.S. 42:1111(C)(5) permits the spouse of a public servant to continue employment with a person who has or is seeking a contractual or other business or financial relationship with the public servant's agency. As Mr. Barnett's employment with the prohibited source did not pre-date the relationship between Magellan and DHH, neither exception would apply. Accordingly, this assignment of error lacks merit.

In Mrs. Barnett's seventh assignment of error, she argues the EAB erred in allowing the BOE to refer to Mrs. Barnett's agency by more than one name or acronym, which she maintains prejudiced her ability to defend herself against the charges. The inconsistencies Mrs. Barnett complains of did not in any way prevent her from preparing her defense. This assignment of error lacks merit.

Finally, in Mrs. Barnett's eighth assignment of error, she argues the EAB ignored mitigating factors, rules of lenity, and numerous precedents that directly compare to her case. However, the EAB's opinion directly contradicts these arguments. The EAB notes in its opinion that Mrs. Barnett sought her supervisors' opinions regarding whether Mr.

19

Barnett could apply to work at Magellan, that Mrs. Barnett was open with her colleagues about her husband's employment with Magellan, and that Mrs. Barnett properly disclosed her husband's employment with Magellan. Taking these factors into consideration, the EAB imposed a fine of only $1,000.00, even though LSA-R.S. 42:1153 authorized a fine of up to $10,000.00, and imposed a penalty of $22,053.74, which was based on an adjusted period of economic advantage. Further, the precedents Mrs. Barnett relies on are all significantly distinguishable from this matter. This assignment of error lacks merit.

## CONCLUSION

For the foregoing reasons, the January 6, 2023 decision of the Ethics Adjudicatory Board is affirmed. Costs of this appeal are assessed to the appellant, Michelle Barnett.

**AFFIRMED.**

20

| STATE OF LOUISIANA | LOUISIANA BOARD OF ETHICS |
|---|---|
| COURT OF APPEAL | IN THE MATTER OF |
| FIRST CIRCUIT | MICHELLE BARNETT |
| DOCKET NUMBER | 2023 CA 0321 |

**MILLER, J., dissenting.**

I write separately to first address the majority's statement that the reviewing court makes its own determinations and conclusions of fact in this EAB appeal. I believe this legal rule has no application here and should not play a part in our analysis.

The majority opinion indicates that Mrs. Barnett appealed to this court pursuant to the authority set forth in La. R.S. 42:1142, which provides in part:

> A. (1) Whenever action is taken against any public servant ... **by a final decision of the Ethics Adjudicatory Board ... or whenever any public servant is aggrieved** by any action taken by the ... Ethics Adjudicatory Board, **he may appeal to the Court of Appeal, First Circuit.**

(Emphasis added.)

In addressing the standard of review, the majority explains that the Administrative Procedure Act (APA) governs judicial review of an EAB decision, with specific reference to La. R.S. 49:978.1. Then, the majority relies on Schmitt v. Louisiana Board of Ethics, 2000-0341 (La. App. 1st Cir. 3/28/01) 808 So. 2d 524, 525, for the proposition that the reviewing court makes its own determinations and conclusions of fact. I believe that if we apply La. R.S. 49:978.1, in its current iteration, the appellate court must consider the findings of a district court under the manifest error standard of review.[1]

---

[1] The jurisprudence reflects conflicting interpretations of La. R.S. 49:964(G)(6) (now La. R.S. 49:978.1(G)(6)) regarding the deference owed by the appellate court to the factual findings of the district court in the judicial review of adjudication of administrative proceedings. See Louisiana Practice Series, Civil Appellate Procedure § 10:155, "Standard of review for administrative determinations." In Schmitt, this court expressed the view that the appellate court

Even so, when we discuss the deference afforded the district court, we must recognize that La. R.S. 42:1142, unlike La. R.S. 49:978.1, does not provide for review by the district court. Under La. R.S. 42:1142, a final decision of the EAB is appealed directly to the First Circuit Court of Appeal as was done here. In fact, this court has already distinguished the district court's "judicial review of adjudication" pursuant to La. R.S. 49:964 from an appeal of a decision of the EAB. In Board of Ethics in Matter of Savoie, 2017-0077 (La. App. 1st Cir. 8/7/17), 224 So. 3d 1246, 1251, this court explained that a "Judicial review of an adjudication" in administrative proceedings pursuant to La. R.S. 49:964 is commenced and heard in the district court with no direct recourse to the court of appeal. The instant appeal is brought pursuant to La. R.S. 42:1142(A)(1), where the district court level of review is not implicated.[2] Under this direct appeal to the First Circuit Court of Appeal, I believe the manifest error standard of review is the proper standard to apply to decisions reviewable pursuant to La. R.S. 42:1142(A)(1).

Secondly, while it is clear to me that Mrs. Barnett improperly received something of economic value (salary received by her community from the prohibited source) I am not convinced that sufficient proof was presented to show that the receipt of this thing was due to services rendered **by the public servant**. Certainly, the EAB has made no such finding.

_____

owes no deference to "the findings of the administrative tribunal," see Schmitt, 808 So. 2d at 525, while in Universal Placement International, Inc. v. Louisiana Workforce Commission, 2011-1353 (La. App. 1st Cir. 7/26/12), 97 So. 3d 1154, 1158, writ denied, 2012-1974 (La. 11/9/12), 100 So. 3d 845, this court "defer[red] to the district court's factual determinations" and applied a manifest error standard of review. In Multi-Care, Inc. v. State, Department of Health & Hospitals, 2000-2001 (La. App. 1st Cir. 11/9/01), 804 So. 2d 673, 675, this court noted that, pursuant to paragraph (G)(6), **the district court** is a fact finder that weighs the evidence and makes its own conclusions of fact by preponderance of the evidence. Accordingly, while this court does not defer to the district court's legal conclusions, we do defer to the district court's factual determinations and use a manifest error standard of review. See Multi-Care, Inc., 804 So. 2d at 675.

[2]For example, La. R.S. 49:978.1(F) provides that the review will be conducted without a jury. This would go without saying if the matter was to be heard in the court of appeal.

Louisiana Revised Statute 42:1111(C) provides that:

(2) **No public servant** and no legal entity in which the public servant exercises control or owns an interest in excess of twenty-five percent, **shall receive any thing of economic value for or in consideration of services rendered,** or to be rendered, **to or for any person during his public service unless such services are:**

\* \* \*

(d) Neither performed for nor compensated by any person from whom such public servant would be prohibited by R.S. 42:1115(A)(1) or (B) from receiving a gift.[3]

(Emphasis added.)

Here, the services to the prohibited source were rendered by Mr. Barnett. The statute does not define a "public servant" broadly to include family members. See La. R.S. 42:1102(19).[4] Moreover, while the Louisiana Supreme Court long ago expanded the definition of a "public servant" under La. R.S. 42:1111(C)(d)(2) to include a corporation controlled by the public servant, it has yet to declare any such

---

[3]Louisiana Revised Statute 42:1115 provides that:

A. No public servant shall solicit or accept, directly or indirectly, any thing of economic value as a gift or gratuity from any person or from any officer, director, agent, or employee of such person, if such public servant knows or reasonably should know that such person:
(1) Has or is seeking to obtain contractual or other business or financial relationships with the public servant's agency, or
(2) Is seeking, for compensation, to influence the passage or defeat of legislation by the public servant's agency.

B. No public employee shall solicit or accept, directly or indirectly, anything of economic value as a gift or gratuity from any person or from any officer, director, agent, or employee of such person, if such public employee knows or reasonably should know that such person:
(1) Conducts operations or activities which are regulated by the public employee's agency.
(2) Has substantial economic interests which may be substantially affected by the performance or nonperformance of the public employee's official duty.

Although a discussion of La. R.S. 42:1115 is implicated by La. R.S. 42:1111(C)(2)(d), we note that, in the instant matter, Mrs. Barnett was not charged with violating La. R.S. 42:1115.

[4]"Public servant" is defined as a public employee or an elected official. La. R.S. 42:1102(19).

3

expansion to include the spouse of a public servant. See Glazer v. Commission on Ethics for Public Employees, 431 So. 2d 752, 758 (La. 1983).[5]

This court has held the provisions of the Ethics Code must be strictly construed. Ellis v. Louisiana Board of Ethics, 2014-0112 (La. App. 1st Cir. 12/30/14), 168 So. 3d 714, 724, writ denied, 2015-0208 (La. 4/17/15), 168 So. 3d 400. Under the rule of lenity, where there is any doubt as to the interpretation of a criminal or civil penal statute, including the penalties imposed by those statutes, **"any doubt in the construction of a penal statute must be resolved with lenity and in favor of the person subject to the fine or penalty."** Ellis, 168 So. 3d at 724. (Emphasis added.) Had the work performed by Mrs. Barnett been performed by a different public servant, we would be unable to characterize the work as being performed **for the prohibited source.** I likewise conclude that Mrs. Barnett has not been shown to have performed work for the prohibited source. See La. R.S. 42:1111(C)(2).

---

[5] In Glazer, the Court noted that recognition of a separate identity between the public servant and a company owned by him would thwart the policy of the legislature embodied in the Code of Ethics, impair public confidence in the integrity of government, unfairly penalize persons who resigned from public service because of similar conflicts, and have a corruptive influence on officials who forgo personally profitable activities inconsonant with their public duties. Glazer, 431 So. 2d at 758. The more expansive view was incorporated into the statute by La. Acts 1983, No. 697, §1 (in subparagraph (C)(2) the words "and no legal entity in which the public servant exercises control or owns an interest in excess of twenty-five percent" were inserted following "No public servant").

4